# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CIVIL ACTION NO. 5:09CV-00003-R

**THOMAS MITCHELL, et al.**                                                           **PLAINTIFFS**

**v.**

**STEVE BESHEAR, et al.**                                                             **DEFENDANTS**

## MEMORANDUM OPINION

Defendants have filed a Motion for Summary Judgment (DN 174). Plaintiffs have filed a Response (DN 175). Defendants have filed a reply (DN 176). Plaintiffs have filed a Surreply (DN 177). Accordingly, this matter is ripe for adjudication.

Plaintiffs have also filed a Motion to File a Surreply (DN 177). This motion is GRANTED, and the Court will consider the Surreply attached to the motion in adjudicating the Motion for Summary Judgment.

## BACKGROUND

Plaintiffs in this case are a number of protective custody inmates housed at Kentucky State Penitentiary. On September 1, 2008, Plaintiffs were escorted from their cells to the dining room for their evening meal. Around the same time that the Plaintiffs were heading towards the dining room, general population inmate Frank Sherman told Officer Noel that she should not eat the burritos being served for dinner that night, because "they've got shit in them." *Kentucky State Penitentiary Information Report Prepared by Officer Melissa Noel*, DN 175-3, pg. 10. Thinking that Frank Sherman was commenting on the general quality of the prison food, and not commenting literally, Officer Noel failed to immediately report the comment to anyone in the kitchen. *Id.*

Plaintiffs arrived at the cafeteria and immediately noticed the smell of feces.[1] Plaintiffs proceeded through the line and received their meal, including the burritos that inmate Frank Sherman stated contained feces. Plaintiffs smelled and tasted their burritos, and found them inedible. Plaintiffs complained to the officers supervising the meal. Upon inspection, the officers also determined that the burritos smelled foul. Around this time, Officer Noel finished her other duties and checked in on the meal. *Id.* After hearing that the inmates and officers both thought the burritos smelled and tasted foul, Officer Noel reported her conversation with inmate Frank Sherman. *Id.* Frank Sherman was placed in handcuffs, briefly questioned and removed to administrative segregation.

Plaintiffs allege that the officers then started telling some, but not all, inmates to stop eating their burritos. At some point, the prison staff moved the inmates back down to their cells and had non-inmate kitchen staff prepare an additional batch of burritos. Once completed, the inmates were escorted back to the cafeteria to complete their meal with the freshly prepared food.

The next day, Plaintiffs began to experience symptoms they felt were connected to the contaminated meal the evening before. Plaintiffs report experiencing headaches, stomach cramps, vomiting, and bloody diarrhea. *Affidavit of Ronnie Gish*, DN 175-2, pg. 11. Plaintiffs attempted to go to sick call and see a doctor, but were refused because the nurse on duty stated that eating feces would not make the inmates sick. *Id.* Plaintiffs followed up with multiple prison officials and were informed by those prison officials that they should report to sick call so

---

[1]Plaintiffs state that, due to the location of a sewage line near the cafeteria, this is a regular occurrence.

that a doctor could see them if they were feeling ill. *Letter from Thomas Mitchell to Deputy Warden Howard*, DN 175-2, pg. 5. After receiving this advice, Plaintiffs reported to sick call a second time on September 10, 2008, and were once again denied treatment. *Id.* However, by this second visit, Plaintiffs were no longer experiencing any of the aforementioned symptoms. *Id.* When the inmates asked that they be tested for diseases that could be transmitted by consuming human feces, Doctor Hiland addressed the group and explained that because the alleged feces would have been cooked, there was no risk of infection. *Id.* He then declined to perform any testing.

After these incidents, Plaintiffs made use of the prison grievance process to no avail. After exhausting the grievance process, Plaintiffs filed this lawsuit and a lawsuit in state court against Aramark employees Wallace and Peek.

## **STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a

mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## **DISCUSSION**

Plaintiffs first claim that they were served contaminated food in violation of the Eighth Amendment. Next, Plaintiffs contend that after eating the allegedly contaminated food, prison officials were deliberately indifferent to their serious medical needs. Finally, Plaintiffs claim that the guards and prison officials have a general duty to protect their prisoners, and that duty was violated when the general population inmates, with a known interest in harming protective custody inmates, were allowed to contaminate the food of the protective custody inmates. Defendant's claim qualified immunity as a defense to all claims.

**1. Qualified Immunity Generally**

The Supreme Court mandates "a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 123 S.Ct. 808, 815 (2009).

> "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right . . . [s]econd, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct."

*Id.* at 815-16. While a court was originally mandated to evaluate the steps in numerical order, the Supreme Court recently stated that "the judges of district courts and the courts of appeals

4

should be permitted to exercise their sound discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first[.]" *Id.* at 818.

**2. Failure to furnish adequate food to prisoners**

The Eighth Amendment requires prisoners be provided with basic human necessities such as "food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 533 (1994). "To establish an Eighth Amendment violation of cruel and unusual punishment, a prisoner-plaintiff must show that a state actor acted with deliberate indifference - knowing disregard - to a substantial risk of serious harm to an inmate. A single incident of food poisoning or finding a foreign object in food does not constitute a violation of the constitutional rights of the prisoner affected." *Green v. Atkinson*, 623 F.3d 278, 280-81 (5th Cir. 2010). In this case, Plaintiffs allege only one incident of food poisoning and presence of a foreign substance. However, the prior cases reviewing instances of food poisoning or foreign substances have always been based on negligence. In the current case, Plaintiffs allege that the food was intentionally contaminated by a fellow inmate and then served with the full knowledge and approval of the state employees supervising the meal. These circumstances are substantially different from the standard negligent food poisoning case. Since this was a one-time event, to the extent that officials were not aware of the alleged contamination, it should be analyzed under the established standard and there would be no constitutional violation. *Smith v. Younger*, No. 98-5482, 1999 WL 623355 (6th Cir. Aug. 9, 1999); *Green*, 623 F.3d 278, 281 (5th Cir. 2010). However, *intentionally* tampering with an inmate's food might allow a plaintiff to demonstrate knowing disregard despite a one-time occurrence.

Defendants deny the presence of any contaminant. However, taking the evidence in the

light most favorable to the Plaintiffs, contamination of the food with some substance is a jury question. Plaintiffs have substantial evidence of contamination. Frank Sherman stated to Officer Noel that there was 'shit' in the food. *Kentucky State Penitentiary Information Report Prepared by Officer Melissa Noel*, DN 175-3, pg. 10. Multiple prisoners and guards reported a foul order and taste associated with the food. *See, e.g.*, *Affidavit*, DN 175-2, pg. 1-15. While Frank Sherman denied both contaminating the food and informing Officer Noel that the food contained 'shit' during an investigation by prison officials, another prisoner claims Frank Sherman continued bragging amongst the prisoners about contaminating the food after the investigation closed. *Affidavit of Eddie Martin*, DN 175-2, pg. 24-25. Taken as a whole, there is clearly enough evidence of contamination to survive summary judgment.

As discussed above, however, a single incident of food poisoning as a result of prison negligence does not create a constitutional claim. Plaintiffs must provide evidence that prison officials demonstrated knowing disregard of a substantial risk of serious harm to the inmates. Plaintiffs have provided almost no evidence of knowing disregard. Officer Noel is the only state actor that had advance knowledge of the potential contamination, supported by evidence submitted by Plaintiffs, that is a party to this case. *Kentucky State Penitentiary Information Report Prepared by Officer Melissa Noel*, DN 175-3, pg. 10. However, Officer Noel thought that Frank Sherman was commenting figuratively on the overall quality of prison food, and did not take the comment literally. *Id*. Accordingly, she does not meet the subjective requirement for knowingly disregarding a serious risk. In fact, once Officer Noel realized that there was some corroborating evidence to Frank Sherman's comment, she informed the rest of the guards and the remaining food was collected from the prisoners and a new meal was prepared and

served. *Id.*

All of the remaining food service employees submitted reports and stated during the subsequent internal investigation that they were unaware of any problems with the food during preparation or service. DN 175-3, pgs. 10- 17. The prison guards testified similarly. *Id.* Plaintiffs suggest that the food service employees and guards were both aware of and encouraged Frank Sherman's contamination of the food. However, there is almost no evidence in the record to support these assertions. Plaintiffs presented only one affidavit to establish that some employees were aware of the alleged contamination in advance. *See Affidavit of Eddie Martin*, DN 175-2, pg 24-25 (stating that the inmates on the kitchen staff and Aramark employees Wallace and Peek were aware of the contamination). However, the employees included in that affidavit are not parties in the instant action. Accordingly, none of the parties involved in the case have shown deliberate indifference by knowingly allowing contaminated food to be served to inmates.

Plaintiffs also argue that the guards should have removed the meal faster once informed by Officer Noel that the threat of contamination might be legitimate. However, any delay in removing the meal was not a result of deliberate indifference by the guards. Rather, the guards were trying to ascertain whether there was actually a problem with the food, contact their supervisors, and determine an appropriate course of action. There is no evidence that any delay on the part of the guards was because of their deliberate indifference to Plaintiffs needs. Allegations of this nature are very serious and, in the current case, have some support; however, the current parties have not acted in a way that rises to the level of a constitutional violation.

**3. Deliberate Indifference to a serious medical need**

As its jurisprudence has evolved, the Supreme Court has stated that the Eighth Amendment encompasses "the evolving standards of decency that mark the progress of a maturing society" and "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotations omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* Failure to provide medical care could produce pain and suffering, physical torture or a lingering death "inconsistent with contemporary standards of decency[.]" *Id.* Accordingly, the "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

However, an "inadvertent failure to provide adequate medical care" or a "negligent [diagnoses or treatment]" does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* at 104-05. Similarly, a dispute over the adequacy of treatment also does not generally result in a constitutional violation. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Rather, an inmate must be "exposed to undo suffering or the threat of tangible residual injury." *Id.*

The difference between negligence and deliberate indifference is discussed in *LeMarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001). A plaintiff must show that an official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 436 (citing *Farmer v. Brennan*, 511 US 825, 837 (1994)). "An official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* A plaintiff can also establish deliberate indifference "by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment [or] . . . when the need for treatment is obvious [and] medical care . . . is so cursory as to amount to no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (citing 11th and 4th Cir. precedent).

In this case, Plaintiffs have alleged deliberate indifference to medical needs on two separate grounds. First, Plaintiffs state that the medical staff was deliberately indifferent to their serious medical needs by refusing to test for any disease that could be spread by the consumption of feces. Second, Plaintiffs state that the medical staff was deliberately indifferent to their serious medical needs when the staff failed to treat their illness, regardless of source, after Plaintiffs reported to sick call.

## A. Failure to Test

Plaintiffs first allege deliberate indifference due to the failure of the medical staff to test for serious communicable diseases that result from the consumption of feces. It is uncontested that the medical staff failed to test for serious communicable diseases, such as HIV or Hepatitis B or C. However, it also seems uncontested that the staff informed Plaintiffs that the failure to test was due to the fact that it was impossible to contract a disease for which testing is required via consumption of feces. Plaintiffs disagree.[2] This clearly falls under the grounds of

---

[2]Plaintiffs have submitted a pamphlet that establishes that Hepatitis A can be transmitted by the consumption of feces. However, unlike Hepatitis B and C, Hepatitis A does not result in a chronic infection. *See* http://www.webmd.com/hepatitis/hepa-guide/hepatitis-a-topic-overview (accessed January 21, 2011) (stating that Hepatitis A does not lead to long-term liver problems and generally goes away on its own). Accordingly, since it has no long-term impacts, there

9

disagreement over a treatment, and does not result in a constitutional violation.

**B. Failure to Treat**

Plaintiffs next allege deliberate indifference due to the failure of the medical staff to treat the illness currently presenting in Plaintiffs when they first reported to sick call. There is a dispute as to whether Plaintiffs informed the medical staff of their symptoms when presenting to sick call initially, or merely demanded treatment for illnesses resulting from the consumption of feces. However, taking the facts in the light most favorable to the Plaintiff, the Plaintiffs informed Nurse Hiland of their symptoms. In response, Nurse Hiland stated the symptoms could not result from consuming feces and declined to provide medical care. Defendants also argue that, because Plaintiffs can show no causation between the potential contamination of burritos with feces and their medical concerns, there can be no deliberate indifference.

While a known risk can contribute to deliberate indifference if symptoms associated with that risk are ignored, a Plaintiff need not always establish causation. Regardless of the potential cause of medical problems, an inmate presenting to sick call with sufficiently serious symptoms warrants treatment. Accordingly, Plaintiffs must demonstrate that they had a "sufficiently serious medical need" and that Defendants failure to treat was sufficiently harmful to evidence deliberate indifference to serious medical needs. *Dominguez v. Correctional Medical Services*, 555 F.3d 543, 550 (6th Cir. 2009). While the Court finds the overall treatment alleged in this case alarming, it does not rise to the level of deliberate indifference. A serious medical need is one that is so obvious that "even a layperson would easily recognize the necessity for a doctor's

---

would be no need to test for Hepatitis A. Rather, potential Hepatitis A exposure is relevant to the failure to treat Plaintiffs.

10

attention." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009). The fact that a medical professional failed to determine that there was a sufficiently serious medical need tends to demonstrate that such a need did not exist. *Id.* at 255 ("Plaintiffs have not established that [a] condition and need for medical attention, which was not obvious to trained medical personnel, would have been obvious to a layperson."). Even without treatment, Plaintiffs admit that their illness was gone in the course of about 5 days. DN 175-2, pgs. 2, 10, 11. Plaintiffs have alleged no long-term or lasting effects as a result of their illness. Plaintiffs have also not alleged that any treatment provided could have substantially alleviated their suffering. *See, e.g.*, *Napier v. Madison County, Ky.*, 238 F.3d 739 (6th Cir. 2001); *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) ("An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs."). Accordingly, a sufficient harm is not present in the instant case to support a constitutional claim.

In conclusion, Plaintiffs lack the evidence to demonstrate the objective and subjective awareness of a serious medical need required to prove a constitutional deliberate indifference claim. When asked by Plaintiffs to test for diseases communicable by consumption of human feces, the medical staff declined, stating that such tests were unnecessary. While Plaintiffs obviously disagree, a disagreement over testing for diseases, especially when Plaintiffs are presenting to the medical staff with no symptoms, is not deliberate indifference. Similarly, the symptoms experienced by Plaintiffs when originally reporting to sick call were not objectively serious enough to rise to the level of a constitutional violation. The symptoms cleared up on their own after five days and resulted in no long-term effects. Accordingly, the medical staff did

not ignore an objectively serious risk and the claims must fail.

**4. Deliberate Indifference to the risk posed to Protective Custody inmates by General Population inmates**

Plaintiffs final allegation is that prison officials were deliberately indifferent to the risk posed by the general population inmates to the protective custody inmates. Deliberate indifference can be shown if an official ignores a "pervasive risk of harm." *Street v. Corr. Corp. of America*, 102 F.3d 810 (6th Cir. 1996). Plaintiffs have alleged that the general population inmates continually tried to harm the protective custody inmates and that the protective custody inmates are susceptible to such harms from the general population. Accordingly, at first blush, Plaintiffs have alleged a constitutional violation.

Defendants, however, are entitled to qualified immunity under the instant facts. While it is well established that a prison must protect inmates from a "pervasive risk of harm," all cases establishing a constitutional violation have revolved around physical assault. This Court has been unable to find precedent where the pervasive risk of harm came from contamination of a food supply. Plaintiffs seem to suggest that the prison had an obligation to supervise the general population kitchen staff preparing food for the protective custody inmates. However, there is no evidence to indicate that an incident similar to the current incident had occurred in the past. In addition, the circumstances of this case are different enough from the physical assault cases such that there is no precedent clearly establishing the right to be protected from intentional food contamination by a fellow inmate, even if Plaintiffs were to establish a general "pervasive risk of harm" from the general population inmates. As a result, the prison officials are shielded by

qualified immunity because there is no clearly established constitutional precedent requiring the prison to guard in such a way as to prevent the harm that occurred in this case.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED